**No. 25-2411, 25-2418**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

---

**JANE DOES 1-10, *Plaintiffs-Appellants,***

**v.**

**MG FREESITES LTD., D/B/A/ PORNHUB.COM; HAMMY MEDIA LTD., D/B/A/ XHAMSTER.COM; MINDGEEK S.A.R.L.; TRAFFICS TARS LTD.; WISEBITS IP LTD., *Defendants-Appellees,***

***And***

**LIMESTONE UNIVERSITY, F/K/A/ LIMESTONE COLLEGE; SHARON HAMMONDS;**

**BRENDA F. WATKINS; MG FREESITES II LTD.; MINDGEEK USA, INC.; MG**

**BILLING LTD.; WISEBITS LTD.; XHAMSTER IP HOLDINGS LTD.; COLLINS MURPHY,**

**Defendants.**

---

**On Appeal from the United States District Court for the District of South Carolina at Spartanburg Case Nos. 7:20-cv-00947-DCC, 7:21-cv-03193-DCC (The Honorable Donald C. Coggins Jr.)**

---

# BRIEF OF AMICI LAW PROFESSORS AND ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF APPELLEES

---

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
Counsel for Amici Curiae

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus Electronic Frontier Foundation states that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock. The other amici are individuals.

Dated: September 16, 2026

/s/ Rebecca Tushnet

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT……………………………………i
TABLE OF CONTENTS…………………..…………………………………ii
TABLE OF AUTHORITIES ........................................................................ ii
STATEMENT OF INTEREST…………………………………………….…1
SUMMARY OF ARGUMENT……………………………………………….2
ARGUMENT ………………………………………………………………3
CONCLUSION ........................................................................................11

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asia Econ. Inst. v. Xcentric Ventures LLC*, No. CV 10-01360, 2011 WL 2469822, at *6 (C.D. Cal. May 4, 2011) .......... 9
*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), *as amended* (Sept. 28, 2009) .......... 3
*Ben Ezra, Weinstein & Co. v. Am. Online, Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) .......... 3
*Braun v. Flynt*, 726 F.2d 245, 254 (5th Cir. 1984) .......... 7
*Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 975 (2026) .......... 3
*Douglass v. Hustler Mag., Inc.*, 769 F.2d 1128, 1135-36, 1138 (7th Cir. 1985) .......... 7
*Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) .......... 3
*Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) .......... 5
*Gonzales v. Google LLC*, 598 U.S. 617 (2023) .......... 3
*Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110 (4th Cir. 2022) .......... 10
*Herbert v. Lando*, 441 U.S. 153, 172 (1979) .......... 8
*M.P. v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir.) .......... 5
*Morgan v. Bulletin Co.*, 85 A.2d 869, 873 (Pa. 1952) .......... 8
*O'Kroley v. Fastcase Inc.*, No. 13-0780, 2014 WL 2197029 (M.D. Tenn. May 27, 2014) (report & recommendation), *adopted*, No. 3-13-0780, 2014 WL 2881526 (M.D. Tenn., Jun. 25, 2014) .......... 8
*O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016) .......... 9
*Twitter, Inc. v. Taamneh*, 598 U.S. 471, 491-92 (2023) .......... 3
*Vazquez Rivera v. El Dia, Inc.*, 641 F. Supp. 668, 669-70, 673 (D.P.R. 1986) .......... 8
*Wood v. Hustler Mag., Inc.*, 736 F.2d 1084, 1092 (5th Cir. 1984) .......... 7
*Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) .......... 3

**Statutes**

47 U.S.C. § 230(b) .......... 7
47 U.S.C. § 230(c)(1) .......... 8

**Other Authorities**

*Juxtaposition*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/juxtaposition (last visited Sept. 2, 2026) ..........................9

Redacted Page-Proof Br. of Appellants at 38, *Does 1-10 v. MG Freesites Ltd.*, Nos. 25-2411, 25-2418 (4th Cir. filed May 11, 2026)..................................................8

**STATEMENT OF INTEREST**

Amici, Eric Goldman (Associate Dean for Research and Professor, Santa Clara University School of Law), Jess Miers (Visiting Assistant Professor of Law, University of Akron), Mark Lemley (William H. Neukom Professor of Law, Stanford Law School), and Rebecca Tushnet (Frank Stanton Professor of the First Amendment, Harvard Law School),[1] are academics who regularly research, write, and teach about Internet law, free speech, and Section 230. We have no personal interest in the outcome of this case.

The Electronic Frontier Foundation ("EFF") is a member-supported, nonprofit civil liberties organization that has worked for more than 35 years to protect innovation, free expression, and civil liberties in the digital world. On behalf of its more than 30,000 dues-paying members, EFF ensures that users' interests are represented in courts considering crucial online free speech issues, including their right to transmit and receive information online. EFF has litigated or participated as amicus curiae in a broad range of internet free expression and intermediary liability cases because they often raise novel issues surrounding free speech and the rights of internet users. *See, e.g.*, *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (citing EFF's amicus brief). EFF believes that 47 U.S.C. §

[1] Individuals' istitutional affiliations are provided for purposes of identification only. No one other than amici has written or made any financial contribution to the drafting of this brief. The parties have consented to the filing of this brief.

230 ("Section 230") is a foundational law that enables internet speech by protecting the intermediaries that all of us rely on to communicate online. EFF thus regularly files amicus briefs in cases that seek to limit Section 230 because they threaten internet users' free speech.

## SUMMARY OF ARGUMENT

Amici write to reinforce the correctness of the District Court's decision here, which ensures that the blame for the awful acts experienced by Appellants is properly attributed to the wrongdoers who uploaded the videos at issue. Although its analysis was correct across the board, we focus here on the false light claims because Appellants allege that the elements of that tort are satisfied because MindGeek "disseminated"—that is, published—the third-party videos with the requisite knowledge, in juxtaposition with other third-party content.

That is, the claim is that the false light tort arises out of the juxtaposition of third-party content—(1) the unlawful recordings directly at issue, which were posted by a third party, (2) third-party consensual pornography, and (3) third-party advertising. But publishing multiple pieces of third-party content is publishing. And it is holding Appellees liable because they published third-party content that Section 230 plainly forbids.

Appellants' argument is the same attempt to sidestep Section 230 by alleging fault in the design of a website that courts have properly rejected whenever "design" means selection and arrangement of content—including juxtaposition. *See, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (citation omitted) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), *as amended* (Sept. 28, 2009)) ("Plaintiff . . . cannot plead around Section 230 immunity by framing these website features [of algorithmic sorting and recommendation] as content. We have held that what matters is whether the claims 'inherently require[] the court to treat the defendant as the "publisher or speaker" of content provided by another.' If they do, then Section 230(c)(1) provides immunity from liability.").

## ARGUMENT

Congress has declared it to be the policy of the United States to "promote the continued development of the Internet and other interactive computer services," and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services." 47 U.S.C. § 230(b). But Internet services could not survive at scale if treated as the publishers of third-party content they disseminate. Before Section 230, the only reliable way for them to avoid liability for defamation and related torts committed by their users was to be entirely hands-off to avoid acquiring knowledge of the existence of any specific

content, with the predictable and tragic consequence of increased proliferation of harmful content. *See Gonzales v. Google LLC*, 598 U.S. 617 (2023) (per curiam); *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 491-92 (2023); *cf. Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 975 (2026) ("Given this degree of removal from the infringing activity and Cox's incomplete knowledge, Cox cannot be found to have intended to aid in any specific instance of infringement committed using the connection that Cox provides.").

In order to solve this moderator's dilemma, Congress designed Section 230 to prevent internet service providers from being treated as the publisher of information provided by a third party, allowing them to moderate content without fear that this would create liability when they failed to remove tortious content. *Ben Ezra, Weinstein & Co. v. Am. Online, Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) ("Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions."); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("§ 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role," and therefore bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content.").

By its terms, Section 230(c)(1) bars claims in which a website is "treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Congress underscored that publishing, for purposes of Section 230, includes arranging content by defining "interactive computer service" to include "tools" that "pick, choose," "filter," "search, subset, *organize*," or "*reorganize*" content. *Id.* § 230(f)(2), (4) (emphasis added). Thus, Congress intended to provide protection for these functions, not for simply hosting third-party content.

Appellants are pellucidly clear that their claims require treating MindGeek as a publisher: "The plaintiffs' allegations—that MindGeek *disseminated* videos of them showering even though it *knew or should have known* that the videos were surreptitiously filmed without consent—were sufficient to state a claim, so the claim should be reinstated." Redacted Page-Proof Br. of Appellants at 38, *Does 1-10 v. MG Freesites Ltd.*, Nos. 25-2411, 25-2418 (4th Cir. filed May 11, 2026) (emphasis added).

A party acts as a publisher when it "reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it." *Barnes*, 570 F.3d at 1102. When a service provider exercises "a publisher's traditional editorial functions," it is "clearly protected by § 230's immunity." *Pinckney ex rel. M.P. v. Meta Platforms Inc.*, 127 F.4th 516, 525

(4th Cir.) (quoting *Zeran*, 129 F.3d at 330, 332), *cert. denied sub nom. Pin ex rel. M. P. v. Meta Platforms Inc.*, 146 S. Ct. 287 (2025). The *M.P.* Court went on to explain that "acts of arranging and sorting content are integral to the function of publishing," *id.* at 526.

The *M.P.* Court endorsed the Second Circuit's explanation that "[a]rranging and distributing third-party information inherently forms 'connections' and 'matches' among speakers, content, and viewers of content, whether in interactive internet forums or in more traditional media. That is an essential result of publishing." *Id.* (quoting *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019)). The alleged "juxtaposition" of videos here is nothing more than a subset of that protected arrangement.[2]

The *M.P.* Court explained that "newspaper editors choose what articles merit inclusion on their front page and what opinion pieces to place opposite the editorial page." *M.P.*, 127 F.4th at 526; *see also id.* ("[T]he fact that Facebook uses an algorithm to achieve the same result of engagement does not change the underlying nature of the act that it is performing. Decisions about whether and how to display

---

[2] *See Juxtaposition*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/juxtaposition (last visited Sept. 2, 2026) (defining juxtaposition as "the act or an instance of placing two or more things side by side often to compare or contrast or to create an interesting effect" and "the state of being so placed").

certain information provided by third parties are traditional editorial functions of publishers, notwithstanding the various methods they use in performing that task.”).

As the Second Circuit reasoned in rejecting a similar claim against a platform’s automated arrangement of content, “[a]ccepting plaintiffs’ argument would eviscerate Section 230(c)(1); a defendant interactive computer service would be ineligible for Section 230(c)(1) immunity by virtue of simply organizing and displaying content exclusively provided by third parties.” *Force*, 934 F.3d at 66. Since the early days of the Internet, services “have always decided, for example, where on their sites (or other digital property) particular third-party content should reside and to whom it should be shown.” *Id.* Such decisions “would have not occurred but for the internet services’ particular editorial choices regarding the display of third-party content,” and are thus covered by Section 230. *Id.* at 67. If anything, the fact that Appellants’ false light claim depends on organizing content on a page displayed to users, rather than on the claim that specific users were recommended particular content, brings this case even closer to the heart of protected publishing conduct.

The question is whether the false light claim, like Appellants’ other claims, seeks to hold Appellees liable for publishing decisions. It does: the alleged implications come from decisions about what third-party content to display and

how to display it. Those are editorial decisions—which Section 230 specifically allows online service providers to make without fear of liability under state law.

Appellants' invocation of "context" as the hook for false light liability concedes that the alleged implication results from editorial decisions about selection and arrangement: Appellants rely on offline cases in which a publisher was responsible for the editorial content of its magazines, which created the actionable context. *See Braun v. Flynt*, 726 F.2d 245, 254 (5th Cir. 1984) (context was supplied by editorial content for which the publisher was responsible); *Douglass v. Hustler Mag., Inc.*, 769 F.2d 1128, 1135-36, 1138 (7th Cir. 1985) (same); *see also Wood v. Hustler Mag., Inc.*, 736 F.2d 1084, 1092 (5th Cir. 1984) (publisher relied on forged consent form). These are, however, precisely the kind of cases Section 230 was enacted to preempt in the context of online third-party content hosting.[3]

[3] Indeed, Section 230 was rendered necessary to allow the development of the Internet because, under defamation and related branches of law, defendants are "publishers" when organizing content. For example, the "impression" created by "[t]he whole layout" of a newspaper can be defamatory. *Morgan v. Bulletin Co.*, 85 A.2d 869, 873 (Pa. 1952). Organizing content by placing a photograph alongside a headline can "publish[] . . . defamatory references." *Id.* Likewise, if a newspaper "arrang[es] the display of articles [and] photographs" so a plaintiff's photograph appears above a defamatory caption, that placement could amount to "publish[ing] defamatory falsehoods." *Vazquez Rivera v. El Dia, Inc.*, 641 F. Supp. 668, 669-70, 673 (D.P.R. 1986) (quoting *Herbert v. Lando*, 441 U.S. 153, 172 (1979)).

Thus, *O'Kroley v. Fastcase Inc.*, No. 13-0780, 2014 WL 2197029 (M.D. Tenn. May 27, 2014) (report & recommendation), *adopted*, No. 3-13-0780, 2014 WL 2881526 (M.D. Tenn., Jun. 25, 2014), *aff'd*, 831 F.3d 352, (6th Cir. 2016), correctly rejected this juxtaposition argument in the defamation context, *id.* at *3. The plaintiff alleged that a search engine's automated excerpting of two sentence fragments separated by an ellipsis was defamatory, although the underlying document was not. *Id.* at *2.The plaintiff, like Appellants here, argued that the platform's "editing process" that produced the juxtaposition was content created by the search engine. *Id.* The Sixth Circuit, in affirming, explicitly rejected O'Kroley's argument, even though Google did more than Appellees here in shortening third-party content. As long as the content itself came from third parties, Section 230 immunity applied. *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016) (Google's "automated editorial acts on the content" were protected by Section 230 despite allegedly falsely linking plaintiff to crime).

More generally, the sorting and grouping of videos is quintessential publishing. Every website that displays third-party content must organize that content. If Section 230(c)(1) does not apply to how Appellees organize third-party videos, then the same argument would impose liability on any search engine or other tool that organizes an otherwise overwhelming torrent of websites, videos, comments, messages, product listings, files, and other information.

The use of tags is similar. For the most part, tags are selected by users and are equally subject to Section 230's immunity for sites that merely allow tagging or edit tags. *See Zeran*, 129 F.3d at 330 ("lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred" by Section 230); *see also Asia Econ. Inst. v. Xcentric Ventures LLC*, No. CV 10-01360, 2011 WL 2469822, at *6 (C.D. Cal. May 4, 2011) (using tags to increase visibility and discoverability in searches was, at most, "'enhancement by implication,' which is insufficient to remove Defendants from the ambit of the CDA").

Unlike the defendant in *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110 (4th Cir. 2022), there is no allegation that Appellees altered "*the content at issue* in ways that make it unlawful," *id.* at 129 (emphasis added). On Appellants' own arguments, the video content itself was and remains unlawful; if it had been lawfully made, there would be no claim of false light. *Cf. id.* ("The content relevant to Counts Two and Four is only unlawful because it is inaccurate. But, as alleged, the content provided to Public Data about [the plaintiff] was not inaccurate. Instead, through Public Data's actions, the records were changed so as to introduce the inaccuracies."). And the tags that one defendant conceded adding—"lesbian" and "amateur"—are not inherently unlawful.

If Appellees had said "these videos are staged and the people portrayed within are consenting adult film actors," that could certainly constitute creation of the relevant information. But Appellants do not allege any such statement by Appellees, only an implicit suggestion created by juxtaposition with other *third-party* content (and a failure to disclose, which again seeks to contest Appellees' editorial decisions). That is, they argue that the third-party content and category tagging on Appellees' platforms created the false impression that the victims were professional performers. Br. of Appellants at 41-43. Under settled precedent and the plain meaning of Section 230's language, this claim impermissibly treats Appellees as publishers.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ Rebecca Tushnet

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
Counsel for Amici Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 2428 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

September 16, 2026 Respectfully submitted,

/s/ Rebecca Tushnet

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
Counsel for Amici Curiae